IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MOUNTAIN DUDES, LLC,<br><br>          Plaintiff,<br><br>v.<br><br>SPLIT ROCK HOLDINGS et al.,<br><br>          Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:13-cv-510-CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

Before the court are Plaintiff Mountain Dudes's and Defendants' multiple motions for judgment as a matter of law. (ECF Nos. 189–93.) The parties moved the court pursuant to Federal Rule of Civil Procedure 50(b) after a five-day jury trial in October 2016 in which the jury was unable to resolve the majority of the issues before it. (Jury Verdict, ECF No. 180.) The court held a hearing on the motions on March 23, 2017, during which the court ordered supplemental briefing on the effect of *Rupp v. Moffo*, 358 P.3d 1060 (Utah 2015), on the fraudulent transfer claims. (Minute Entry, ECF No. 210.) Mountain Dudes filed its brief on April 13, 2017 (ECF No. 211), and Defendants responded on April 20, 2017 (ECF No. 212). The motions are now ripe for decision. After careful consideration of the arguments set forth in the briefs, oral argument, and the supplemental briefs, the court now GRANTS judgment as a matter of law in favor of Defendants on their fraudulent transfer motion (ECF No. 193) and unjust enrichment motion (ECF No. 192), DENIES Mountain Dudes's fraudulent transfer motion (ECF No. 189), and DISMISSES the remaining motions as moot (ECF Nos. 190–91).

**BACKGROUND**[1]

I.      H<small>ISTORY OF</small> S<small>PLIT</small> R<small>OCK</small>, I<small>NC.</small>

Defendants Joseph Platt and Kent Bylund formed Split Rock, Inc. (SRI) in the late 1980s in St. George, Utah. (October 6, 2016 Trial Transcript (Day 3), at 474, ECF No. 186.) Eventually each of the individual Defendants, other than Patrick Manning, became partners in SRI, and SRI grew to employ some 200 individuals. (*Id.* at 485.) SRI was a real estate development company that conducted master planning of multi-subdivision communities. (*Id.* at 474–75.) It also built homes that were considered the gold standard for construction in the region. (October 5, 2016 Trial Transcript (Day 2), at 425, ECF No. 207.) In fact, many of SRI's homes were featured in the local Parade of Homes. (*Id.* at 424–25.) Entrada is a development in St. George where SRI held certified builder status and had deed restrictions on the Warranty Deeds for some of the undeveloped lots. (October 4, 2016 Trial Transcript (Day 1), at 91–94, ECF No. 185.) If enforceable, the deed restrictions would have allowed SRI to require the property owner to use SRI for any construction on the property. (*Id.* at 93.)

Despite its prior success, SRI struggled to pay its debts in 2008 and 2009 as the Great Recession began affecting the St. George real estate market. (*Id.* at 50, 77–78; Day 3, at 485, ECF No. 186.) By 2009, the employees had left and banks were foreclosing on SRI's properties. (Day 3, at 485, ECF No. 186.) SRI amassed as much as $50 million in debt, including $8 million owed to Zions Bank, at least $6 million owed to Barnes Bank, and $3.8 million owed to Far

---

[1] The following is a limited overview of the facts as they were presented during a five-day jury trial in October 2016 and, where relevant, from the dockets of this case as well as its predecessor, *Mountain Dudes v. Split Rock Inc. et al.*, 2:08-cv-940. In presenting these facts, the court declines to weigh the evidence or determine the credibility of the witnesses, as doing so is inappropriate on a motion for judgment as a matter of law. *Harsco Corp. v. Renner*, 475 F.3d 1179, 1185–86 (10th Cir. 2007).

West Bank; though it never entered bankruptcy. (Day 1, at 78–79, 110, ECF No. 185.) Mountain

Dudes, who held a judgment for $1,175,507.98, was among SRI's creditors. (*Id.*; Case No. 2:08-

cv-940, Clerk's Judgment, ECF No. 166.)

## II.    MOUNTAIN DUDES'S FIRST SUIT

On December 5, 2008, Mountain Dudes sued SRI related to an Entrada real estate

contract. (Case No. 2:08-cv-940, ECF No. 2.) Mountain Dudes moved the court for summary

judgment on June 17, 2009. (*Id.*, ECF No. 45.) On November 19, 2009, this court granted

summary judgment on Mountain Dudes's breach of contract claim against SRI, but it denied

summary judgment on the value of the damages for that breach. (*Id.*, ECF No. 60.) The parties

then filed a second set of summary judgment motions, which the court resolved in April 2011,

leaving only the issue of damages to be decided by jury trial. (*Id.*, ECF Nos. 62, 69, 88, 136.)

The case stalled, however, and on March 23, 2012, the court issued an order to show cause

requiring SRI to demonstrate why default judgment should not be entered against it in light of its

failure to respond to a pending motion. (*Id.*, ECF No. 149.) SRI again failed to respond, and on

August 31, 2012, Mountain Dudes moved the court for default judgment. (*Id.*, ECF No. 152.)

SRI opposed that motion, but ultimately the court granted it and entered default judgment in

Mountain Dudes's favor and against SRI for $1,175,507.98 on November 9, 2012. (*Id.*, ECF

Nos. 164–66.) On August 25, 2014, Mountain Dudes sought a writ of execution on the judgment

against SRI to the assets of Split Rock Holdings, LLC; Joseph Platt; Stone Puma, LLC; Kent

Bylund; Mountain Meadow Farms, LLC; Patrick Manning; and Patrick Manning LLC. (*Id.*, ECF

No. 247.) None of whom were named in the judgment. Those assets totaled $3,687,234. (*Id.*) On

January 21, 2015, this court denied Mountain Dudes's efforts to execute on the judgment. (*Id.*, ECF No. 264.)

III.     F<span style="font-variant:small-caps;">ORMATION OF</span> S<span style="font-variant:small-caps;">PLIT</span> R<span style="font-variant:small-caps;">OCK</span> H<span style="font-variant:small-caps;">OLDINGS</span>

Meanwhile, SRI and its members were struggling to survive the Great Recession. According to the testimony of Defendants Joseph Platt and Robert Manning, some members believed that SRI could survive if it avoided bankruptcy and paid at least its smaller creditors. (Day 1, at 56, ECF No. 185; Day 2, at 401, ECF No. 207.) Collectively the members of SRI determined SRI had two remaining assets: (1) the "Split Rock" name and (2) the Entrada deed restrictions, which would have required lot purchasers to give SRI any contract to build on those lots within a certain time, or alternatively, to grant SRI the opportunity to purchase the property. (Day 1, at 56, 79, 93–94, ECF No. 185.) Some of the members believed that, if SRI sold these assets to a new company, the new company could capitalize on them without being impeded by debt, as SRI would be. (*Id.* at 80, 87–88, 98.) Thus, on June 24, 2009, Platt, Ren Boyce, Kent Bylund, and Bart Smith—four of the five then-existing members of SRI—formed a new entity called Split Rock Holdings, LLC (Holdings). (*Id.* at 54–55; Mountain Dudes's Exhibit 5.) In short, Holdings' stated purpose was to acquire properties to use, develop, and otherwise profit from. (Mountain Dudes's Exhibit 5.) Hence, it entered the Sale of Assets Agreement (the Agreement) with SRI in which SRI agreed to transfer the "Split Rock" name and the deed restrictions to Holdings in exchange for a $2.7 million promissory note. (Day 1, at 80–82, ECF No. 185; Mountain Dudes's Exhibit 6.) The $2.7 million price was assessed based on SRI's members' belief about the value of the two assets, not on any separate evaluation of the assets' fair market value. (*See* Day 1, at 107, ECF No. 185.)

The Agreement provided that a promissory note would be signed and delivered upon closing and that interest payments would be made on an annual basis with a final balloon payment due in June 2015. (Mountain Dudes's Exhibit 6, Section 5.1.) Whether the promissory note was ever returned signed was disputed during trial. Platt's testimony assumed the note was returned sign, but Manning called into question whether that was the case, saying he did not "believe" it was ever "executed or signed." (*Compare* Day 1, at 85–87, ECF No. 185, *with* Day 2, at 401, ECF No. 207.) No signed copy or original of the note was ever produced or received in evidence at the trial. Mountain Dudes's expert witness admitted that he never saw a signed promissory note while conducting his partial audit. (Day 2, at 312, ECF No. 207.) On July 30, 2009, SRI changed its name to Old SPI.[2] (Day 1, 95–100, ECF No. 185; Mountain Dudes's Exhibit 10.)

Sometime shortly after its creation, Defendants Smith and Boyce left Holdings to form Split Rock Construction (Construction), which exclusively builds homes. (Day 2, at 382, 443, ECF No. 207.) After the split, Holdings entered a commission agreement with Construction by which Holdings would generate leads and refer them to Construction. (*Id.* at 413.) Holdings referred the jobs to Construction, which provided a competitive bid, and assuming it won, would then pay a referral fee to Holdings. (*Id.* at 228.) According to Smith's testimony, Construction built two homes pursuant to its agreement with Holdings in 2009 and forty-six between 2010 and 2013. (*Id.* at 226.) Only some of those homes were built on lots with deed restrictions. (*Id.* at 226–27.) Manning testified that while Construction paid some funds to Holdings based on profits

---

[2] Though the present entity is Old SPI, not SRI, the court uses the SRI name to reference both for continuity and clarity.

from deed restrictions, that Construction also paid Holdings a portion of profits that were entirely unrelated to the deed restrictions and, therefore, not required to be paid to SRI under the Modification. (Day 1, at 191, 193, ECF No. 185.) During trial, Smith testified that Construction was not a subsidiary of either SRI or Holdings and that a portion of Construction's business is separate from, and does not involve, Holdings and the deed restrictions. (Day 2, at 382–83, ECF No. 207.) He further testified that when Construction does work unrelated to Holdings or the deed restrictions, it does not pay a percentage to Holdings or its members. (*Id.* at 383–84.) According to Manning's testimony, the relationship between Construction and Holdings is not exclusive, and Holdings aims to have similar agreements with other builders. (*Id.* at 413.)

IV.     ENFORCEABILITY OF DEED RESTRICTIONS

While SRI and its members were forming Holdings and working to transfer the assets to Holdings, Patrick Manning became involved. (*Id.* at 399.) He initially viewed the deed restrictions as a valuable source of revenue for Holdings, and at trial he testified to formerly believing the restrictions "might be a good launchpad" for Holdings because they represented a "guarantee of 200 builds." (*Id.* at 400.) He acknowledged, however, that some of Holdings' members disagreed. (*Id.* at 401.) He testified that "there were a couple of Split Rock, Inc. members that felt that they were absolute bulletproof" but "there were other members that thought . . . they were not enforceable and thought that there was actually some liability associated with it as it relates to people not liking being told who they have to use to build." (*Id.* at 401.)

Eventually, before Manning formally joined Holdings as a member, Manning notified his attorney of the $2.7 million Agreement and of the deed restrictions. (*Id.* at 402, 429, 433.) His

attorney advised that the deed restrictions may not be enforceable and "chastised" Manning "for letting" the Agreement documents be signed. (*Id.*) Manning's attorney also notified him that Holdings could be sued for slander of title if it attempted to enforce the restrictions. (*Id.* at 403.) And Manning acknowledged at trial that he could have talked to his attorney before the Agreement was signed and that information about the potential problems with enforcing the deed restrictions was available to him and the members of SRI and Holdings before they signed the Agreement. (*Id.* at 429–30.) Despite his involvement, Manning was not a party to the Agreement. (Mountain Dudes's Exhibit 6.)

Around this same time, as Manning testified, the Entrada Property Owners Association (EPOA) notified Holdings that it would revoke the preferred builder status of any builder that attempted to require a landowner to employee their services pursuant to one of Holdings' deed restriction. (*Id.* at 403, 430–32; Day 3, at 496–97, ECF No. 186.) It made such warnings in committee meetings that Platt attended, before the full board, and in a public town meeting of all the Entrada property owners in November 2009. (Day 3, at 496–99, 502, ECF No. 186.) In the wake of EPOA's threats, and upon the advice of Manning's attorney, the partners as a group determined the deed restrictions had no value, or at least very little value, despite continued resistance by some among the group. (Day 1, at 107, ECF No. 185; Day 2, at 403, ECF No. 207.)

Upon realizing the difficulty in using the deed restrictions to develop business, Holdings entered a modification agreement with SRI (the Modification). (Day 1, at 107–10, ECF No. 185.) Under the Modification, Holdings owed for a period of five years 8% of earnings on deed restrictions due upon payment, but no less than $135,000, rather than a set annual payment. (*Id.* at 103, 109–10; Mountain Dudes's Exhibit 11.) During trial, Platt acknowledged that he hoped

Holdings would be able to pay more than the $135,000, and in turn pay some portion of SRI's

debts, but that he had no assurances that it would be able to do so. (Day 1, at 111–12, ECF No.

185.) The Modification contemplated cancellation of any previous note, though it made no

affirmative representation of such a note. (Mountain Dudes's Exhibit 11.) Platt, acting as vice

president for SRI, signed a promissory note in conjunction with the Modification on January 21,

2010. (Day 1, at 105, ECF No. 185; Mountain Dudes's Exhibit 12.)

Manning testified that the Modification was an attempt to more realistically reflect the

value of the deed restrictions without foreclosing the possibility that they may prove as valuable

as Pratt and Manning once hoped. (Day 2, at 404, ECF No. 207.) He testified that by setting

"$135,000 for the baseline in that modification agreement[,] the minimum [Holdings] would pay

because [it was] absolutely acquiring the name of Split Rock even if [it was not] able to execute

on any of the deed restrictions" and the deed restrictions would be compensated based on

Holdings' performance. (*Id.*) Based on Manning's calculations, which he reached by his own

formula that looked at "the empirical data that existed at that time with the average cost of

home[s] being built [and] the average construction profit," the deed restrictions could be worth

"in excess of $3 million," or "3.2 million roughly." (*Id.* at 404, 407.) Manning further testified

that Holdings took no action to impede the value of the deed restrictions. (*Id.* at 407.) He

acknowledged that no court had ever adjudicated the enforceability of the deed restrictions, but

he testified that Holdings had been sued on the theory that the restrictions were unenforceable.

(*Id.* at 407–08.) He testified that 8% was paid to SRI every time a deed restriction resulted in

revenue to Holdings, (*id.* at 408), although he questioned whether such revenue actually resulted

from the deed restrictions because Construction secured all of its jobs through the competitive

bidding process, even for properties subject to a deed restriction, to avoid legal action from the property owners or EPOA, (*id.* at 409). Manning believed the Split Rock name was worth $135,000, but he acknowledged that the terms of the Modification did not make that clear and that he had no basis for that valuation other than his personal belief. (*Id.* at 435–37.) Of the almost $200,000 that Holdings actually paid, Manning testified $135,000 could be viewed as credit for the name and the remainder as being for the deed restrictions, though he acknowledged that, under that logic, nothing would have been paid for the name if the deed restrictions resulted in only $135,000. (*Id.* at 435–36.) He also testified the money earned was a royalty on the name because of the reliance on the competitive bidding process. (*Id.* at 451–52.)

Between 2009 and 2014, Platt, Bylund, and Manning drew approximately $1.1 million in salary, with some of those payments being made before the Modification. (Day 1, at 116, 137, ECF No. 185.) According to Platt, this was to keep the members on the job so they could work down their debts, rather than simply file for bankruptcy. (*Id.* at 100, 107, 157.) While the Assignment and the Modification represented the formal effort to pay SRI's debts, individual partners continued to personally pay various subcontractors and suppliers; however, Mountain Dudes received no such payments. (*Id.* 79, 154; Day 2, at 412–13, ECF No. 207.)

## V.     THE PRESENT ACTION AND TRIAL

Mountain Dudes sued SRI, Holdings, Construction, the Individual Defendants, and several other related entities in June of 2013. (Complaint, ECF No. 2.) It alleged, among other claims that it did not pursue at trial, that the Modification amounted to a fraudulent transfer under the Utah Code, or in the alternative unjust enrichment; and that SRI, Holdings, Construction, various subsidiaries of the aforementioned, and the Individual Defendants were

liable to Mountain Dudes in the amount of its judgment as the alter egos of SRI. (*Id.*; Amended Complaint, ECF No. 63.) It sought approximately $1.5 million, representing the value of its judgment and interest. (Amended Complaint, ECF No. 63.)

During trial, each of the Individual Defendants testified as a part of Mountain Dudes's case-in-chief and the defense. Questioning focused on the formation of Holdings and Construction as well as the relationship between those entities, various "DBAs," and other related entities. Mountain Dudes also spent significant time developing a record regarding personal LLCs and family corporations that the Individual Defendants owned and through which they received payments, to which payments Mountain Dudes claimed it was entitled.[3] Additionally a CPA and certified fraud examiner named Todd McKinnon testified as an accountant regarding the Asset Purchase Agreement and the Modification, the corporate structure that Mountain Dudes alleged existed between the various entities, the use of LLCs to receive payment, and the nature of the expenses paid through the corporate accounts. (Day 2, at 243–44, 258, ECF No. 207.)

McKinnon has previously taught courses in accounting and auditing, worked with auditors to evaluate their performance according to professional accounting standards and firm policy, and worked for "Big Four" accounting firm Ernst & Young. (*Id.* at 244–46.) He is a member of the American Institute of Certified Public Accountants and the Utah Association of Certified Public Accountants, and presently works for a regional firm called Tanner LLC where

---

[3] During trial, the Mountain Dudes put on substantial evidence related to how those funds were managed and the nature of the entities into which the funds were deposited. Such evidence was to support Mountain Dudes's various theories for clawing back the funds. Because the court rules against Mountain Dudes on each of its claims for relief, the facts related to individual liability are irrelevant.

he served as an audit partner for the nine years prior to trial. (*Id.*) During Mountain Dudes's case in chief, McKinnon testified that, as an audit partner, his job is to audit other auditors and verify the accuracy of financial statements and accounting records. (*Id.* at 246.) He also testified that he had audited over 1,500 clients at the time of trial. (*Id.* at 248.)

McKinnon testified that goodwill is, for accounting purposes, "the value paid for a company beyond any tangible or other intangible assets." (*Id.* at 261.) He testified that, in his opinion, an accountant should assume a party entering a contract did so upon the belief that the contract "is valid and complete." (*Id.* at 263.) Therefore, according to McKinnon, a change to a contract, in particular a change in the value of the contract such as occurred in this case, should prompt an accountant to inquire about the cause of the change. (*Id.*) In particular an accountant should consider whether there was a change of circumstances after the contract was entered that prompted the forgiveness of the original debt. (*Id.*) He stated that the difference in value of approximately $2.5 million between the Agreement and Modification should be considered debt forgiveness because at the time of the original Agreement, the contracting parties believed that the transferred assets were worth $2.7 million and "a change in value based off subsequent events does not modify the original value." (*Id.* at 267–68.)

McKinnon did not conduct a complete audit of any of the Defendants, he did not review any tax return or accounting records from Defendants' accountants, and he did not review profit and loss statements or otherwise review Defendants' tax reconciliation processes. (*Id.* at 275–76.) McKinnon also acknowledged that the estimated $200,000 paid to SRI under the Modification represented the "fair value" of the assets and liabilities associated with the sale of the deed restrictions on 200 homes. (*Id.* at 293.) He further acknowledged that, had the deed

restrictions been enforceable, Holdings would have been liable to Mountain Dudes under the Modification for even more than $2.7 million. (*Id.* at 293–94.) McKinnon also acknowledged his opinion "could be considered" "slopp[y]" and that he based his opinion on the Amended Complaint, but not the Answer, and only a small fraction of the documents that Defendants provided to Mountain Dudes and that Mountain Dudes provided him. (*Id.* 287, 312–13.)

## VI. Verdict Form

During trial, the court instructed the jury on the law of fraudulent transfers, unjust enrichment, successor liability, and alter ego as well as the defense of mutual mistake. It then asked the jury to complete a special verdict form that addressed each of those issues. The form was complex, with some questions contingent upon the jury's response to others. After more than fifteen hours of deliberation over two days, the jury notified the court that it had reached a unanimous verdict as to some but not all questions on the special verdict form and that it needed instruction on how to proceed. (ECF Nos. 174–75.) The court instructed the jury to return to the jury room and complete the special verdict form by answering those questions it could and crossing out those about which it could not unanimously agree. (ECF No. 175.)

Ultimately, the jury concluded that, while SRI and Holdings made a mutual mistake about the value of the deed restrictions and Split Rock name, Holdings bore the risk of that mistake and therefore was not protected from liability under the defense of mutual mistake. (Jury Verdict, ECF No. 180.) On the three fraudulent transfer claims, the jury could not agree whether the Modification constituted a transfer, which is a necessary element of each alleged violation of the Fraudulent Transfers Act. (*Id.*) The jury did, however, agree as to some of the other elements

of the various fraudulent transfer claims. (*Id.*) The jury did not agree on any of the questions related to unjust enrichment, successor liability, or alter ego. (*Id.*)

Before the court submitted the case to the jury, each party moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). Mountain Dudes moved on the fraudulent transfer claims. (ECF No. 173.) Defendant moved on the fraudulent transfer, unjust enrichment, successor liability, and alter ego claims. (ECF No. 164–67.) The court granted in part Defendants' successor liability motion, resolving that claim as to all but Defendant Holdings, and denied the other motions without prejudice. (ECF No. 183.) Defendants timely renewed their motions under Rule 50(b) except for the successor liability motion. (ECF Nos. 191–93.) Mountain Dudes renewed its motion and filed, for the first time, for judgment as a matter of law of the alter ego claim. (ECF Nos. 189–90.)

**ANALYSIS**

Judgment as a matter of law is appropriate if, after a party has been fully heard on an issue, "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1)(B) & (b). When so moved, the court may "direct entry of judgment as a matter of law," *id.* R. 50(b)(3), if it concludes that "the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1198 (10th Cir. 2015) (quoting *McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1136 (10th Cir. 2006)). When considering a motion for judgment as a matter of law, the court must "construe the evidence and inferences most favorably to the nonmoving party, and will refuse to weigh the evidence, pass on the credibility of the witnesses, or substitute [its] conclusions for those of the jury." *Harsco*

*Corp. v. Renner*, 475 F.3d 1179, 1185–86 (10th Cir. 2007). The court will only consider a Rule

50(b) motion if the movant first moved on the same grounds during trial under Rule 50(a). *See*

*Marshall v. Columbia Reg'l Hosp.*, 474 F.3d 733, 738 (10th Cir. 2007).

## I.    FRAUDULENT TRANSFER

Mountain Dudes alleges that a fraudulent transfer occurred under each of the following

three sections of the Utah Fraudulent Transfers Act: (1) § 25-6-5(1)(a); (2) § 25-6-5 (1)(b)(ii);

and (3) § 25-6-6(1).[4] It is Mountain Dudes's burden to prove each element of a fraudulent

transfer claim by clear and convincing evidence.[5] Mountain Dudes's theory for each of the three

fraudulent transfer claims is that SRI, in violation of the Act, transferred the difference in value

between the Agreement and the Modification to Holdings when it accepted the variable price in

the Modification in place of the set price in the Agreement. (Mountain Dudes's Alter Ego

Motion, at 3, ECF No. 189.) In other words, Mountain Dudes contends the Modification was a

transfer of $2.5 million from SRI to Holdings in the form of debt forgiveness. Mountain Dudes

further argues that, as SRI's creditor, it is entitled to recover the value of the transfer from every

---

[4] While the instant motions were pending, these code sections were renumbered as §§ 25-6-202(1)(a), -202(1)(b)(ii), and -203(1). Because the previous version of the statute was cited in the briefs and governs this case, the court refers to the prior numbering.

[5] The 2017 amendments to the Fraudulent Transfers Act state that "[a] creditor making a claim for relief . . . has the burden of proving the elements of the claim for relief by a preponderance of the evidence." Utah Code Ann. § 25-6-202 (West 2017). The amendment was enacted during the 2017 Legislative session and does not apply to this case, in which the parties agreed clear and convincing was the burden and no party argued it should be otherwise. The prior version of the statute identified no burden of proof, and the court instructed the jury that the burden for the three fraudulent transfer claims was "by clear and convincing evidence" (ECF No. 178) in light of Defendants' proposed jury instructions (ECF No. 141), to which Mountain Dudes did not object (ECF Nos. 150 & 187), and Mountain Dudes's proposed verdict form (ECF No. 170). Therefore, the court applies the heightened standard used at trial, prior to the clarification of the Utah Legislature, which governs cases moving forward. *See Harvey v. Cedar Hills City*, 227 P.3d 256, 259–60 (Utah 2010).

person and entity who benefited from that transfer, up to the value of its judgment against SRI plus interest. (*Id.* at 5–7.)

Each relevant section of the Act requires, as a threshold matter, that "[a] transfer was made or an obligation incurred by a debtor." Utah Code Ann. § 25-6-5(1) (West 2013). The conditions under which an alleged transfer was made then affect whether that transfer was fraudulent and therefore actionable. Because the court concludes, however, that under Utah law there was no transfer in this case, it declines to consider the additional requirements under each code section. Mountain Dudes has failed to prove a transfer occurred for two reasons: (1) Mountain Dudes failed to show by clear and convincing evidence that the Agreement was ever completed, and (2) Mountain Dudes failed to show by clear and convincing evidence that the value of the "Split Rock" name and the deed restrictions exceeded the value of the Modification such that SRI's creditors were harmed.

First, no reasonable jury could find Mountain Dudes showed there was an asset because it did not provide clear and convincing evidence that the $2.7 million promissory note, which was to be consideration for the Agreement, was ever signed and delivered; therefore, it failed to prove SRI was legally entitled to the debt it is alleged to have forgiven. A promissory note, if completed, was alleged to have been an asset worth $2.7 million,[6] as it would have been "the subject of ownership." *Id.* § 25-6-2(10). Additionally, any legal claim, such as that created by a contract, may also have been an asset. *See, e.g.*, *In re Ortiz*, 477 B.R. 714, 722 (E.D. Wis. 2012)

---

[6] As a matter of economic valuation, the face amount of the note should be reduced by the risk of the likelihood of collection. Because Mountain Dudes failed to prove the note was in fact executed, the court need not address whether its value was less than the face amount. The evidence supported that the risk of noncollection would have been high even if the note had been executed in light of SRI's debt exceeding $50 million. (Day 1, at 78–79, 110, ECF No. 185.)

("A legal claim (or chose in action) is an asset."). But where, as here, the alleged promissory note was consideration for the contract, the validity of the promissory note and Agreement logically must rise and fall together. (*See* Mountain Dudes's Exhibit 6 (The obligation to pay a purchase price of $2.7 million "shall be represented by a promissory note in substantially the form set forth on Schedule 5 hereto ('Note'), to be made and delivered by the Purchaser at Closing.").)

At trial, evidence that the promissory note and Agreement were completed included the following: Mountain Dudes submitted a document titled Sale of Assets Agreement that was signed on behalf of SRI by Joseph L. Platt as Vice President and Ren Boyce, Joseph L. Platt, Kent Byland, Bart Smith, and Weldon Larsen as members and on behalf of Split Rock Holdings LLC by Ren Boyce as President; the Agreement lists the name "Split Rock" and all deed restrictions as assets purchased and includes among the attachments signed copies of the assignments of each; the Agreement lists the purchase price as "$2,700,000, paid at the date of closing" in the form of a promissory note that was substantially similar to the unsigned note that was attached to the Agreement; and the Agreement contemplates that Holdings would pay the $2.7 million in the form of five annual payments of accrued interest and a final payment of all unpaid interest and accrued interest, to be paid on June 24, 2015. (Mountain Dudes's Exhibit 6.)

But there was also evidence that indicated the Agreement was never completed. Most notably, Mountain Dudes failed to produce a signed promissory note that had been exchanged during the closing process. Instead, the parties presented inconclusive testimony about whether the promissory note had ever been signed and whether Holdings ever intended to agree to the Sale of Assets Agreement. Platt was asked whether the Promissory Note attached to the

Agreement was the one SRI and Holdings "agreed upon" and that "was agreed to be signed," to which he replied "that it appear[ed]" to be the agreed upon note but continued that he "couldn't say yes or no" as to whether the note provided was the one agreed upon. (Day 1, at 85, ECF No. 185.) He then answered that he did not know "what happened to the original signed version." (*Id.*) He never personally volunteered that a promissory note had in fact been signed. He did, however, agree with counsel's statements that SRI gave the assignments of the deed restrictions and name to Holdings and that Holdings gave the note to SRI. (*Id.* p. 87.) Contradicting of Platt's testimony, Manning testified that he does not believe the promissory note was ever signed. (Day 2, at 401, ECF No. 207.) His testimony suggested that Holdings had already begun to reconsider the value of the deed restrictions and for that reason declined to enter the promissory note. (*Id.* at 401–02.) Mountain Dudes's own expert also acknowledged he never saw a signed copy of the promissory note. (*Id.* at 312.)

Because on a motion for judgment as a matter of law, the court declines to weigh the evidence or make credibility determinations, the court must ask whether a reasonable jury could have concluded that clear and convincing evidence existed that the promissory note was signed and delivered at the closing. *See Harsco Corp.*, 475 F.3d at 1185–86. No such evidence exists: no promissory note was ever produced and the only testimony weighing in favor of it was the testimony of Platt, who admitted not to be the most reliable witness and stated he had not been candid with the court in the past (Day 1, at 47, ECF No. 185), had sometimes let his ego get the best of him when making decisions (*id.* at 53–54), and that his age sometimes caused him difficulty in keeping track of things (*id.* at 76). The fact that all of the other documents were signed and delivered does not support that the sample promissory note included as "Schedule 5"

with the Agreement submitted into evidence was also signed, as Mountain Dudes has argued (Supplementary Briefing, at 6, ECF No. 211), because the Agreement states that Schedule 5 is an example and contemplates that an entirely different promissory note could have been provided as consideration for the Agreement (Mountain Dudes's Exhibit 6, Section 5.1). The jury was unable to agree on this issue, and because Mountain Dudes's burden is to prove a fraudulent transfer by clear and convincing evidence, the court determines there was a failure of proof during trial and no reasonable jury could find in Mountain Dudes's favor for this reason.

Second, the Modification was not a transfer because it did not convey an "asset." The Act defines a "'[t]ransfer'" as "every mode, direct or indirect, absolute or conditional, or voluntary or involuntary, of disposing of or parting with *an asset* or an *interest in an asset*, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Utah Code Ann. § 25-6-2(12) (emphasis added). An asset is "property of a debtor," not including property that is "encumbered by a valid lien," "exempt under bankruptcy law," or "held in tenancy by the entireties" such that it is not "subject to process by a creditor holding a claim against only one tenant." *Id.* § 25-6-2(2). And "'[p]roperty' means anything that may be the subject of ownership." *Id.* § 25-6-2(10).

In *Rupp v. Mofo*, 358 P.3d 1060 (Utah 2015), the Utah Supreme Court concluded that there had been no transfer of an asset where a woman was allowed to live rent free in a home owned by an insolvent debtor because the home was fully encumbered by a mortgage, *id.* at 1064–65. The Supreme Court stated that the Act's purpose is to "provide[] a remedy for creditors who are actually harmed"  by a transfer of "property." *Id.* at 1064. Real property fully encumbered by a lien that exceeds the value is not an "asset" for purposes of the Act because the

insolvent's unsecure creditors cannot ever recover the value of fully encumbered real property and, therefore, could not be harmed. *Id.* at 1064–65. Therefore, an insolvent debtor who transfers an asset, putting it out of reach of his or her creditors, harms the creditors where a solvent debtor does not. *Id.* Here it is undisputed that SRI was insolvent, leaving this court to determine whether the property in question, even if valued at $2.7 million, made the Modification a "transfer." Because, as the example of fully encumbered real property demonstrates, the Act operates on a "no-harm-no-foul" basis, *id.* at 1065, whether a transfer occurred depends upon whether the alleged transfer harms SRI's creditors.

The Modification, and the debt relief Mountain Dudes claims it conferred on Holdings, was not a transfer because Split Rock, Inc., could never have recovered $2.7 million, regardless of the face value of the Agreement. Given that the evidence does not support that the Agreement was ever completed, the court must only determine whether there is some evidence to suggest that the amount paid under the Modification was less than the true value, which Mountain Dudes contends is $2.7 million, such that Mountain Dudes could have been harmed. The Modification created a method whereby the market set the value of the deed restrictions. Mountain Dudes claims, based on McKinnon's testimony, that the face value, rather than the fair market value, is the true value of the assets, but McKinnon provided no basis for his assertion other than his experience. He provided no prior experience from which he could draw such a conclusion. And the evidence that the deed restrictions were worth much less was overwhelming: EPOA warned it would remove builder status from anyone seeking to enforce the restrictions, a lawsuit was filed, and ultimately Construction had to resort to the competitive bidding process rather than rely on the deed restrictions for leads Holdings generated. As the court observed in *Rupp*, the

Fraudulent Transfers Act was enacted to "provide a remedy for creditors who are actually harmed when a debtor transfers property," not for "only theoretical harm." *Id.* at 1064. As such, the Act applies where a creditor can be compensated, but not where nothing of any value changes hands, hence the creditor could not be compensated, regardless of the transfer, as is the case here. *Id.*

II.     UNJUST ENRICHMENT

Defendants next moved for judgment as a matter of law on the issue unjust enrichment. (ECF No. 192.) Unjust enrichment is an equitable theory that permits the court to imply a contract when no valid contract actually exists. *Selvig v. Blockbuster Enters., LC*, 266 P.3d 691, 698 (Utah 2011). To prove unjust enrichment in Utah, a plaintiff must prove (1) that "a benefit [was] conferred on one person by another," (2) that "the conferee . . . appreciate[d] or ha[d] knowledge of the benefit," and (3) that the conferee retained the benefit "under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value.'" *Desert Miriah, Inc. v. B & L Auto, Inc.*, 12 P.3d 580, 583 (Utah 2000). The question before the court is whether Mountain Dudes set forth competent evidence that a reasonable jury could conclude Holdings was liable to SRI (and Mountain Dudes in its shoes) for the amount by which Holdings was unjustly enriched.

Because of the court's conclusion that there was no fraudulent transfer, and because Mountain Dudes has alleged no other basis to invalidate the contract, Mountain Dudes cannot legally prove unjust enrichment. It is well-settled Utah law that "where 'an express contract covering the subject matter of the litigation' exists, recovery for unjust enrichment is not available." *Selvig*, 266 P.3d at 698 (quoting *Mann v. Am. W. Life Ins. Co.*, 586 P.2d 461, 46

(Utah 1978)). Mountain Dudes's theory of unjust enrichment is that the Defendants received the benefit of "debt forgiveness," which they knew about and retained in the form of salaries paid to the Individual Defendants. But the Modification is a valid contract in which the parties agreed to amend the price figure, meaning an express contract governs the subject of this litigation—the transfer of Split Rock, Inc.'s assets—Mountain Dudes cannot prove its claim for unjust enrichment.

### III.    ALTER EGO

Alter ego is a theory of "derivative liability," "render[ing] individual officers responsible for an obligation of a company." *Heaps v. Nuriche, LLC*, 345 P.3d 655, 658 (Utah 2015). Therefore, if the company owes the plaintiff no relief, there is also no basis to consider alter ego. *Jones & Trevor Mktg., Inc. v. Lowry*, 284 P.3d 630, 634 n.1 (Utah 2012) ("Alter ego theory is not an independent claim for relief; rather, it is a theory of liability.").[7] Because the court concludes that Mountain Dudes cannot, as a matter of law, prove that any Defendant has committed a fraudulent transfer or been unjustly enriched, there is no basis for alter ego liability. Rather the motions for judgment as a matter of law on the alter ego claims are both moot.[8]

---

[7] In *Boxer F2, L.P. v. Bronchick*, No. 16-1360, 2018 WL 503429, (10th Cir. Jan. 22, 2018) (unpublished), the Tenth Circuit upheld the Colorado district court's conclusion that, despite the plaintiff's failure to prove its claims against the corporate defendant that the individual defendant was "personally accountable" for the harm plaintiff suffered because "equity required piercing . . . the corporate veil," *id.* at * 2. That decision does not, however, bind this court because it is unpublished and lacks precedential value and, more importantly, interprets and applies Colorado law, while this court is applying Utah law that directly prohibits the holding of *Boxer F2*.

[8] Defendants' response to Mountain Dudes's motion on this issue observes that Mountain Dudes failed to move the court on this issue during trial and that the motion is not properly before this court. (Dkt. No. 199.) Thus the court concludes that Mountain Dudes motion is not properly before it. (Dkt. No. 190.) And concludes that the improper filing is an alternative means for denying Mountain Dudes's alter ego motion.

**CONCLUSION**

Mountain Dudes has failed to provide competent evidence from which a reasonable jury could conclude that any Defendant committed a fraudulent transfer or was unjustly enriched. Therefore, Mountain Dudes's fraudulent transfer motion (ECF No. 189) is DENIED, Defendants' fraudulent transfer motion (ECF No. 192) and unjust enrichment motion (ECF No. 193) are GRANTED, and the alter ego motions (ECF No. 190–91) are DISMISSED as moot. During trial, the court granted judgment as a matter of law in all Defendants' favor, except Holdings, as to successor liability. (ECF No. 183.) The parties have not moved the court as to successor liability, but the court concludes the claim for successor liability is moot for the same reason as the alter ego claim.

DATED this 14th day of March, 2018.

BY THE COURT:

_Clark Waddoups_
Clark Waddoups
United States District Judge